NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO S.C.

No. 1 CA-JV 23-0031
FILED 9-14-2023

---

Appeal from the Superior Court in Maricopa County
No. JD31472
JS21133
The Honorable Christopher Whitten, Judge

**AFFIRMED**

---

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant Denroy C.*

David W. Bell Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant Diamond H.*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Co-Counsel for Appellee Department of Child Safety*

The Huff Law Firm, PLLC, Tucson
By Daniel R. Huff, Laura J. Huff
*Co-Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

---

Judge Cynthia J. Bailey delivered the decision of the Court, in which Presiding Judge James B. Morse Jr. and Judge Brian Y. Furuya joined.

---

**B A I L E Y**, Judge:

¶1          In this consolidated appeal, Diamond H. ("Mother") and Denroy C. ("Father") appeal the termination of their parental rights to S.C. ("the child"). For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2          "We view the facts in the light most favorable to upholding the juvenile court's order." *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010) (citation omitted).

¶3          Mother and Father have never been married. Mother is the child's biological mother, and Father is the putative biological father, although he has never established paternity.

¶4          In 2017 and 2018, the superior court terminated Mother's parental rights to three of her children born between 2015 and 2017 based on her inability to discharge parental responsibilities because of mental illness or deficiency. *See* Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(3). Father was not involved in those proceedings.

¶5          In 2019 and 2020, Mother and Father became the parents of two other children, K.B. and H.C., who were placed in a permanent guardianship in October 2020 over concerns about Mother's and Father's ability to parent the children safely; namely, that Mother's mental illness or deficiency was of such magnitude that it rendered her incapable of parenting or even benefitting from reunification services and that Father was mentally delayed, had a history of failure to protect, and had a self-reported history of domestic violence and murder.

¶6          The child was born in September 2021, and hospital staff alerted the Department of Child Services ("DCS") that they were concerned about Mother's ability to care for the child upon her discharge because of Mother's HIV-positive status, the child's need for a strict medical regimen, and Mother's apparent inability to administer needed medication outside

of a controlled environment without professional assistance. Father visited the hospital the day after the child was born, but he did not seek to "put his name down" on the birth certificate. Despite multiple subsequent attempts, DCS could not immediately locate Father. Mother did not know his whereabouts and said that she was "doing this alone."

¶7 Soon after, DCS took temporary physical custody of the child, placed her with K.B.'s and H.C.'s permanent guardian, and petitioned for dependency as to Mother, Father, and any John Doe,[1] given that neither Father nor any other person had established paternity or sought custody or parenting time with the child.

¶8 Mother and Father failed to appear at the December 2021 pretrial hearing and therefore waived their right to contest the dependency. The child was adjudicated dependent as to Mother, Father, and John Doe. The court approved a case plan of family reunification.

¶9 DCS referred Mother for a psychological evaluation, which was conducted in November 2021. Dr. Latoya Smart, Ph.D., diagnosed Mother with Moderate Intellectual Disability based on her IQ of 61, placing her in the "extremely low" range compared to her same-aged peers. Dr. Smart noted that although Mother had made some progress during her years of receiving DCS services, she "has not and will not make sufficient progress to independently care for a child."

¶10 Father was uninvolved in the dependency, and DCS could not contact him until February 2022, when he contacted DCS. DCS referred Father for numerous services, including paternity testing and visitation. Father attended one supervised visit with the child in March 2022, but did not see the child again until June 2022. Father visited the child several times in August 2022, then refused visits when they were no longer held in-home. Father failed to establish paternity through the referred service provider or by signing an acknowledgement of paternity.

¶11 In February 2022, DCS petitioned to terminate Mother's parental rights on the mental-illness and –deficiency ground and Father's/John Doe's parental rights on the abandonment ground, amending the petition in July 2022 to include the six- and nine-month out-of-home placement ground as to Father. The superior court changed the case plan from family reunification to severance and adoption.

---

[1] John Doe is a fictitious name for any other male individual claiming to be the father of the child.

**¶12** The superior court held a four-day contested severance trial in October and November 2022, and in February 2023, terminated Mother's and Father's parental rights on each of the grounds alleged, as well as John Doe's parental rights on the abandonment ground.

**¶13** We have jurisdiction over Mother's and Father's timely appeals under Article 6, Section 9, of the Arizona Constitution, A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1), and Rule 601 of the Arizona Rules of Procedure for the Juvenile Court.

## DISCUSSION

### I. Standard of Review

**¶14** To terminate parental rights, a court must find clear and convincing evidence of at least one statutory ground in A.R.S. § 8-533(B) and must find by a preponderance of the evidence that termination is in the child's best interests. *See Kent K. v. Bobby M.*, 210 Ariz. 279, 288, ¶ 41 (2005); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 12 (2000). Because the superior court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts," *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009) (citation omitted), we will accept its factual findings if supported by reasonable evidence and inferences, and we will affirm the order terminating parental rights unless it is clearly erroneous. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3, ¶ 9 (2016); *accord Brionna J. v. Dep't of Child Safety*, CV-22-0158-PR, 2023 WL 5024023, at *5, ¶¶ 30–31 (Ariz. Aug. 8, 2023) (clarifying the standard of review).

### II. Mother's Appeal

**¶15** Mother does not directly challenge the statutory basis for terminating her parental rights to the child or that severance was in the child's best interests, except to argue that the superior court abused its discretion in finding that DCS made a diligent effort to provide her with appropriate reunification services.

**¶16** The state has a constitutional duty to make a reasonable effort to preserve the family before seeking a severance on mental-illness grounds. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶¶ 32–33 (App. 1999). DCS is required to take rehabilitative measures with a reasonable prospect of success, but need not undertake measures that are futile. *Id.* at ¶ 34. DCS does not have to provide every conceivable service, but it must provide a parent with the time and opportunity to participate

in programs designed to improve the parent's ability to care for the child. *Id.* at ¶ 37 (citation omitted).  DCS has not met its duty "when it neglects to offer the very services that its consulting expert recommends."  *Id.*

**¶17**         Here, DCS offered Mother supervised visitation, a case aide to facilitate that visitation, case-management services, transportation, domestic-violence counseling, counseling and mental-health care through the SMI program and Copa Health Metro, team decision-making meetings, and two social workers from the Family Involvement Center to act as her advocate.  DCS also referred Mother to the Nurturing Parent Program ("NPP"), which provided education on parenting skills.  Mother failed to participate in NPP adequately and was eventually closed out of the program for lack of engagement after repeated re-referrals.  Despite a lack of progress over the course of several dependencies, DCS provided Mother with services reasonably calculated to improve her ability to parent, and Mother generally failed to participate meaningfully.  Reasonable evidence supports the superior court's finding that while DCS's reunification efforts were not perfect, they were nevertheless reasonable.

**¶18**         DCS also provided Mother with a psychological evaluation, and Mother argues that DCS did not meet its duty because it did not follow the recommendations of Dr. Smart, who performed that evaluation. Mother notes that both Dr. Smart and the DCS case manager said that PTSD counseling could have benefitted her, and she maintains the single counseling session she received through the Family Involvement Center was deficient.  Mother concludes that DCS did not give her the time and opportunity to improve her parenting skills.

**¶19**         Mother's argument ignores an essential portion of Dr. Smart's psychological evaluation.  Dr. Smart recommended that Mother continue to receive PTSD and trauma counseling through her therapist.  However, Dr. Smart made clear in her evaluation and testimony that this would be for Mother's own personal development and benefit but would not enable her to parent independently. DCS therefore did not fail to meet its duty by not referring Mother for trauma counseling.  Dr. Smart's evaluation, along with similar prognoses from two doctors in prior dependencies involving Mother, supports the superior court's finding that "no amount of services

would be likely to create a scenario where Mother is able to discharge parental responsibilities."[2]

### III. Father's Appeal

#### A. Termination on the Ground of Abandonment

¶20 Father argues the superior court erred in terminating his parental rights to the child on the abandonment ground. Father asserts that he demonstrated good cause for failure to establish paternity and made more than minimal efforts to maintain contact with the child. We disagree.

¶21 "The failure of an alleged parent who is not the child's legal parent to take a test requested by the department or ordered by the court to determine if the person is the child's natural parent is prima facie evidence of abandonment unless good cause is shown by the alleged parent for that failure." A.R.S. § 8-533(F). Father notes DCS did not provide him the option of signing an acknowledgement of paternity, and he argues that DCS failed to inform him how to participate in paternity testing, which he maintains constitutes good cause for his failure to establish paternity under A.R.S. § 8-533(F).

¶22 Father's DCS case manager referred Father to PSI Testing ("PSI") for paternity testing when she first met with him in February 2022. She explained to him the importance of establishing paternity for reunification with the child and that he needed only to walk into PSI and ask for a paternity test, with no appointment necessary. She also offered him bus passes to get there. DCS gave Father an adequate opportunity to establish paternity by referring him to PSI and providing transportation. Father failed to take the final step, which only he could accomplish— arriving at PSI and requesting a paternity test. Accordingly, Father has not shown good cause for failing to establish paternity.[3] Therefore, Father's

---

[2] The previous doctors had opined that Mother's "mental illness and deficiency conditions are considered to be chronic and will last for her entire life." Dr. Smart concluded similarly.

[3] This record demonstrates Father is not as unaware of how to establish paternity as he suggests. He established paternity of his son, K.B., by signing an acknowledgement of paternity. *See* A.R.S. § 25-814(A)(4). Father concededly had the opportunity to establish paternity when he visited the child in the hospital after she was born, but he did not do so, and

abandonment of S.C. is supported by prima facie evidence per A.R.S. § 8-533(F).

**¶23** Father also argues the superior court erred in finding he did not make more than minimal efforts to support and communicate with the child as required by A.R.S. § 8-531(1). To support his argument, Father cites his attendance and participation in court hearings and supervised visits.

**¶24** For parental rights to be terminated on abandonment grounds, A.R.S. § 8-531(A)(1) requires "a judicial finding that a parent has made only minimal efforts to support and communicate with the child." A parent's effort is measured by their objective conduct, not their subjective intent. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 249, ¶ 18 (2000). Further, "the juvenile court's legal conclusions regarding the statutory ground for termination—which must be established by 'clear and convincing' evidence at the juvenile court level—will be affirmed unless they are clearly erroneous." *Brionna J.*, 2023 WL 5024023, at *5, ¶ 31 (citation omitted). We are not to disturb the superior court's determination in that regard unless "as a matter of law [] no one could reasonably find the evidence to be clear and convincing." *Id.* (citation omitted).

**¶25** Father visited the child at the hospital when she was born in September 2021, but made no effort to see her over the next five months until he contacted DCS in February 2022. Father had his first visit with the child in March 2022—six months after her birth—and did not visit her again until three months later—in June 2022. Father participated in several visits between June and August 2022, but ultimately refused visits altogether after mid-August 2022 until severance. Father provided no gifts or support for the child aside from a toy during his March 2022 visit. But he does not argue or point to any record evidence that excuses his failure to provide the child with reasonable support. Father has been entirely absent for most of the child's life, and only sporadically involved for the rest. Reasonable evidence supports the superior court's finding that Father has not demonstrated that he provided the child with reasonable support, nor maintained a normal parent-child relationship with the child, and has therefore abandoned her.

**¶26** "If clear and convincing evidence supports any one of the statutory grounds on which the juvenile court ordered severance, we need not address claims pertaining to the other grounds." *Jesus M. v. Ariz. Dep't*

---

he could have asked to sign an acknowledgement of paternity, but he never did so. *See* A.R.S. § 25-814(A)(3)–(4).

*of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 3 (App. 2002) (citations omitted). We therefore do not address Father's arguments related to the out-of-home placement grounds for severance.

### B. The Child's Best Interests

**¶27** Father also argues the superior court abused its discretion in finding that termination of his parental rights was in the child's best interests. Father asserts that the court failed to consider the guardianship granted for K.B. and H.C. with the child's current placement.

**¶28** When addressing a motion to sever, the superior court is required to consider the child's best interests. A.R.S. § 8-533(B). To conclude that severance is in the child's best interests, a court must find either "the child would benefit from a severance or be harmed by the continuation of the relationship." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990) (citations omitted).

**¶29** The guardianship granted for Father's other two children, K.B. and H.C., and the superior court's concurrent finding that severance was not in their best interests have no bearing on whether severance is in this child's best interests. *Cf. Kimu P. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 39, 42, ¶ 12 (App. 2008) (finding evidence related to a child born during dependency proceedings irrelevant to the older children's best interests); *see also Cassandra S. v. Dep't of Child Safety*, 1 CA-JV 21-0003, 2021 WL 2434266, at *2, ¶ 17 (Ariz. App. June 15, 2021) (mem. decision) (concluding that DCS's decision to allow other children to remain in the mother's care did not demonstrate that she could care for the child at issue).

**¶30** The superior court found that severance would benefit the child because she is adoptable and her needs were being met with her current placement, which planned to adopt her, providing her with security, stability, and permanency. The superior court also found that maintaining the parent-child relationship would be detrimental to the child because her parents will be unable to offer her a secure or stable environment for the foreseeable future. Father does not challenge any of these findings, which are supported by the record. The superior court made all necessary findings for the best-interests requirement, and Father has not shown that the court erred in its best-interests analysis.

## CONCLUSION

**¶31** The superior court's order severing Mother's and Father's rights to the child is affirmed.



AMY M. WOOD • Clerk of the Court
FILED:    AA